Greco, P.J.
The plaintiff-homeowners, Joseph and Nancy Bertrand (“Bertrands”), filed this action against Merrimack Mutual Fire Insurance Company (“Merrimack”) to recover benefits they alleged were due under their insurance policy with Merrimack for damage to their property caused by a fire. The trial court granted summary judgment to Merrimack, and the Bertrands have appealed.
The following facts were undisputed. On August 24,2006, the Bertrands suffered substantial damage to their home from a fire. Their policy with Merrimack included coverage for damage to their home (“Coverage A” under the policy), damage to or loss of personal property (“Coverage C”), and “Loss of Use” of their property (“Coverage D”). Under Coverage D, “[i]f a loss.... makes that part of the ‘residence’ where [the insured] resides not fit to live in,” the insurer will cover “Additional Living Expenses, meaning any necessary increase in living expenses incurred by [the insured] so that [the insured’s] household can maintain its normal standard of living” (emphasis in original). Any payments under this coverage would be “for the shortest lime required to repair or replace the damage.” Merrimack paid the Bertrands $439,481.00 for damage to their house, $191,877.50 for damage to their personal property, and $53,230.73 for additional living expenses. The first two amounts exhausted the limits of Merrimack’s liability under Coverages A and C. After the above amount for additional living expenses had been paid, there remained approximately $19,000 of available benefits under Coverage D. The Bertrands sought to tap into this remaining Coverage D amount by claiming that they were entitled to be compensated for what they paid to store and maintain their “salvageable personal property,” arguing that continued access to this property was necessary to maintain their normal standard of living. They sought compensation at the rate of $260.00 a month for the period from September 1, 2006 to April 8, 2008. Merrimack, however, took the position that any claim for storage costs would fall under Coverage C, which had been exhausted, and not Coverage D. (Merrimack also claimed that any coverage under D would have “run only to August 25,2007.”)
*86 As in all such policies in Massachusetts, the Bertrands’ policy stated that if the parties “fail to agree on the amount of loss,” the dispute may be referred “to a three member board of referees.” The decision of the board would be “binding,” although the board “does not make decisions about matters of coverage or fault.” Section 99 of G.L.C. 175 prescribes the form of all such policies in Massachusetts and sets out this reference procedure in greater detail. Under the statute if the parties are unable to agree on the amount of a loss
it is mutually agreed that the amount of such loss shall be referred to three disinterested men, the company and the insured each choosing one out of three persons to be named by the other, and the third being selected by the two so chosen; and the award in writing by a majority of the referees shall be conclusive and final upon the parties as to the amount of loss or damage, and such reference, unless waived by the parties, shall be a condition precedent to any right of action in law or equity to recover for such loss. ...
Such a reference was made in this matter. According to their award, the three referees appointed “heard evidence by stipulation, testimony and exhibits” on July 15, 2008. The record before us, however, does not indicate the substance of any such stipulations, testimony, or exhibits. The award simply states that “the duly appointed referees... determined the amount of loss and damage” payable under the policy for additional living expenses was “$0.00.” No explanation of the basis for that conclusion was stated. The award was signed by two of the three referees; the referee who did not sign was the person selected by Merrimack from the names supplied by the Bertrands. See G.L.c. 175, §100. The award also indicates that it was “[ejxecut-ed in triplicate... and published by the First Class Mail to counsel of record for the parties.”[2]
The provision in the standard home insurance policy that the decision of a board of referees is “binding” is of limited effect. Such a decision clearly does not preclude a lawsuit. Indeed, as stated in § 99, the reference procedure is a “condition precedent” to a subsequent lawsuit. However, both §99 and §101E of G.L.c. 175 provide that a decision of a board of referees is final as to the amount of the loss sustained by the insured. See Employers’ Liab. Assur. Corp., Ltd. v. Traynor, 354 Mass. 763 (1968). How application of these provisions actually works in a particular situation can be somewhat problematic.
The Supreme Judicial Court addressed the effect of a decision of the referees on a subsequent lawsuit in Fox v. Employers’ Fire Ins. Co., 330 Mass. 283 (1953) and Augenstein v. Insurance Co. of N. America, 372 Mass. 30 (1977). In Fox, the plaintiff sought to recover under his fire insurance policy for damage to his garage caused by lightning. The referees awarded $317.00 after a hearing at which there had been evidence of damage caused by lightning and also damage by wind. At a subsequent trial, a jury found that the loss caused by lightning amounted to $3,825.00; the insur- *87 anee company appealed. On that appeal, the property owner argued that the amount of loss found by the referees was not binding since they improperly “took it upon themselves to determine the question of ... liability.” Id. at 286. In sustaining the exceptions of the insurer, the Court stated that “ [i]n order intelligently to determine the amount of loss or damage under a given policy, as an incidental step in their deliberations, the referees must reach their own conclusions as to what they think that loss or damage is. Such conclusions must necessarily be affected by what they think the coverage is. Their views so far as ultimate liability goes are wholly tentative and in no sense a decision on that underlying question.” Id. at 287-288. However, the Court concluded that the award by the referees of $317.00 was supported by evidence “tending to show that the entire damage was due to windstorm.” Accordingly, the jury’s verdict could not stand. In so ruling, the Court stated its understanding that it was not being contended that “the referees... were in error in their construction of the policies.” Id. at 289.
Further clarification came in Augenstein. In that case, the insured claimed $50,000.00 under his policy for theft of jewelry. The §99 reference procedure was invoked, and a majority of the referees found that a $50,000.00 loss had been sustained. When the insurer failed to pay, the insured commenced an action on the policy, relying on the award of the referees. The position of the insurer at trial was that there had been no loss and that the claim was a sham. The evidence at trial mirrored that presented to the referees; the jury, however, found for the insurer. (The trial judge had denied the insured’s motion for a directed verdict.) Id. at 31-33. After discussing Fox, the Court stated that where the construction of the policy was not at issue, a finding by the referees “would be conclusive of the loss as well as the amount.” Id. at 36. The Court noted that such “was the situation in the Fox case, as there was no contention that the referees had construed improperly the critical words ‘lightning’ and ‘windstorm.’” Id. However, the Court went on to pose the following: “But suppose a case where there was a question of construction — and thus a problem of coverage going to ultimate liability. The Foxcase indicated that the referees were still to find the amount of loss in light of their own interpretation of the terms of the policy, but the question of construction would remain open for reexamination in an action on the policy, if one should eventuate.” Id. at 37.[3]
In the case at bar, the conclusion is inescapable that the referees’ award was based on their interpretation of the actual language used in Coverages C and D. There is no indication in the record before us that Merrimack ever contested the fact that the Bertrands incurred this expense. Even if Merrimack were correct as to the cutoff date under Coverage D, the Bertrands incurred at least some of those expenses before that date. This was not a situation where the amount of the loss had been set and the subsequent trial would determine whether the insurer was liable for that amount. Nor was this a situation where in determining that there was no lia- *88 bilily, the referees had only to resolve the ordinary meaning of commonly used words — for example the difference between lightning and wind (as in Fox) or what is a theft (as in Augensteiri). The interpretations required in this case to determine which coverage applies are far from self-evident. Coverage C addresses loss of property, but the storage fees incurred obviously related to properly not lost or damaged in the fire. In Coverage C, specific items are listed and applicable limitations on them set out. While rented property is mentioned, that provision could arguably be interpreted as referring to damage to, and not use of, such rental property. An argument can also be made that the Bertrands needed access to their stored property to maintain their “normal standard of living,” especially if their temporary residence was smaller than their damaged home.[4] We conclude that in these circumstances, the trial judge was presented with a “question of construction” that he had to resolve unfettered by the decision of the referees.
We cannot discern, however, the basis for the judge’s allowance of Merrimack’s motion for summary judgment. He may have found that there were no illegalities in the reference procedure and that the $0.00 award was binding on him; or he may have properly reached the construction issue and found that any coverage for the storage expenses would have been under the exhausted Coverage C. “[A]ny ground supporting the judgment” may be considered on appeal. Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). Compare, however, Pupecki v. Madison Corp., 376 Mass. 212, (1978), where the Supreme Judicial Court chose to examine only those grounds argued on appeal by the party who had sought summary judgment. Id. at 215-216. Here, both in the trial court and on this appeal, the gravamen of Merrimack’s argument related to the binding effect of the award (other than to argue that there were no irregularities in the reference procedure). There has never been a real discussion at trial, or on appeal, by either party about the language used in Coverages C and D. In these circumstances, it appears highly probable that summary judgment was granted on the erroneous ground that the reference award was binding. Even though the interpretation of a contract is generally a question of law, any argument as to the interpretation of these provisions is best made in the first instance in the trial court. Accordingly, summary judgment was not appropriate. That being the case, we need not address the other illegalities in the reference procedure alleged by the Bertrands, or their claims under G.Lc. 93A and c. 176D.
Accordingly, the summary judgment for the defendant is vacated, and the case is returned to the trial court for trial, or for further proceedings on the defendant’s motion for summary judgment.
So ordered.

 Section 101A of G.L.C. 175 provides that the “referees shall reduce their award to writing and execute it in duplicate. The third referee shall forthwith publish the same by delivering one of the duplicates to the company, and one to the insured, but the same may be published in any other lawful manner.”

 In Augenstein, since there was no suggestion “that the referees misconceived the meaning of ‘theft’ and thus were mistaken as to coverage... or any other illegality or mistake of law” by the referees, id. at 37-38, the Court held that the insured’s “motion for a directed verdict should have been allowed on the basis of the referees’ award.” Id. at 34.

 In a separate section setting out additional coverages related to damaged property, the insurer agreed to “pay the reasonable cost incurred... for necessary measures taken solely to protect against further damage.” While the items stored by the Bertrands were not damaged, query whether this provision is some indication of an intent by the insurer to minimize future damages.